## Corbin v. Milward.

(Decided March 27, 1914.)

### Appeal from Fayette Circuit Court.

1. Contracts—When Terms of Cannot Be Altered by Parol Testimony.—The terms of a written contract for the building of a house cannot, in the absence of fraud or mistake, be changed or altered by parol testimony.

2. Contracts.—Where a contract was for the building of a house and its equipment, to be used as an undertaking establishment, and the specifications mentioned certain coffin cases in a show room, as shown by the detail drawings, and neither the plans nor the specifications showed the details and no detail

drawings were ever made before the contract was let, the coffin cases were not included in the contract of the successful bidder.

GEORGE E. WEBB for appellant.

FALCONER & FALCONER for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

On July 14, 1905, the appellant Frank Corbin made a written contract with the appellee W. R. Milward for the erection of a building to be used as an undertaking establishment on North Broadway, in Lexington, for which Milward was to pay the sum of $25,000.00.

Corbin erected the building, and in doing so he furnished extra labor and material aggregating $1,684.95, making the total amount due Corbin $26,684.95. On this account Milward paid in cash and received credit for old material aggregating $25,397.32, leaving a balance of $1,-287.63, for which Corbin filed this suit and asserted a builder's lien upon the property.

The answer denied that Corbin had complied with all the terms of the contract; and while it admitted certain extras had been furnished, it denied others and claimed certain credits which had not been given in the petition.

As these small matters have, however, been disregarded by both sides upon this appeal, we will so treat them.

The principal claim set up in the answer was that Corbin did not furnish certain show cases or coffin cases which the answer alleged Corbin had agreed to furnish, and which defendant had caused to be made at a cost of $982.50.

The only issue, therefore, as the case is now presented is this: Did the contract require Corbin to furnish the coffin cases in question?

The decision turns upon the construction to be given the following clause in the specifications, which constituted a part of the contract, to-wit:

## "INSIDE FINISH."

"All inside finish in main and private office and the show room and hall on second floor to have quarter-sawed oak, inside casings, base, stools, and aprons, carpet sills, etc., *this also includes the cases, complete, in show room,* all as shown by the detail drawings. All to be hand cleaned and put up by experienced workmen; all

other finish throughout the plastered rooms to be of clear yellow pine as per details.''

In the copy of the specifications used by Corbin and filed herein, the underscored words ''this also includes the cases, complete, in show room,'' are stricken out by an ink line drawn through them with a pen. Corbin testifies that the clause was marked out on the specifications when they were delivered to him, and before he made his bid; while Stanley Milward, who represented his father throughout this transaction, says the words in question had not been stricken out at any time by him or by his authority, and that the first he knew of the claim that they had been stricken out and did not constitute a part of the contract, was after the work had been about completed.

The plans were made in sections, and also constituted a part of the contract. The room in question was on the second floor, and was to be used for the purpose of exhibiting coffins. It was designated upon the plans as the ''show room,'' and its general outline or floor plan only was shown.

The only thing shown by the plans, beyond the walls and openings, was a line drawn on the floor plan which indicated that three spaces next to the wall and marked ''cases,'' were to be used for that purpose. The floor lines, the word ''cases,'' and the phrase ''No hardwood finish under cases,'' written upon the face of the plan, constitute everything that appeared upon the original plans furnished Corbin for the purpose of making his bid, and constitute the details of the plan over which this controversy arose. Corbin says the notice ''No hardwood finish under cases,'' explains why the lines and the word ''cases'' appear on this plan, and that it was merely to show that there was no hardwood floor to be put in these spaces, since the lines and notice shown by the plan gave no data or information whatever as to the size, material, or character of the coffin cases, which are a very expensive character of cabinet work.

Corbin finished the building about April 1, 1906. In February, 1906, Stanley Milward, with Giannini, his architect went to Louisville for the purpose of procuring data and information as to latest improvements in undertakers' show rooms, from which the architect was to prepare elaborate detail drawings for a set of show cases for coffins in the new building. About March 29, 1906, after the building had been practically completed,

these detail drawings for the coffin cases were shown to Corbin, for the first time, by Milward who demanded of Corbin that he furnish them. Upon Corbin's refusal to do so for the reason that they were not embraced in his contract, Milward had them made at a cost of $982.50, which he seeks to charge as a counterclaim against the balance of $1,287.63 due on Corbin's contract price.

It will be seen, therefore, that the issue is clear cut and cannot be compromised. The contract either required Corbin to furnish the coffin cases, or it did not require him to do so. Milward is entitled to recover the entire cost thereof, or he is entitled to recover nothing upon that score.

The chancellor being of opinion that the contract upon this point was, under the proof, in inextricable confusion, divided the cost between the parties, charging each with $490.25; and after charging Milward with an admitted balance of $213.80, he gave Corbin judgment for $704.50, without interest. Corbin appeals, and for error insists that the court should have given him judgment for the full amount sued for, without any deduction on account of his refusal to make the coffin cases.

Two questions have been argued upon this appeal: (1) were the words above indicated erased from the specifications at the time Corbin made his bid; and if not, (2) did the clause in the specifications above quoted, treating them as originally written, and without any erasure, bind Corbin to furnish the coffin cases?

We will pass the first question and leave it undecided, and dispose of the case upon the second issue discussed, since the result must be the same, whether the disputed words be left in the specifications, or erased therefrom.

Corbin and Milward flatly contradict each other as to the erasure. Williamson, a contractor who bid upon this building, is the only other witness upon that question; and in making his bid Williamson used the specifications which were subsequently used by Corbin. Williamson says the erasure had not been made when he made his bid, and finding the disputed clause in the specifications, it became necessary for him to consider the disputed clause in making his bid. The specifications as to the coffin cases were so indefinite that Williamson could not make, and did not undertake to make, an intelligent bid upon that subject. They could not, however, be overlooked.

Upon that subject Williamson says: "When I read the specifications and referred back again to the plans I found there was no definite statement as to what kind and what character the cases were to be, if there were to be any; and in order to find out and inform myself, I went to see Mr. Stanley Milward and inquired from him in regard to these cases."

"I asked him was he going to include the cases, and if so, what he was going to put there; and he told me no; the cases were not to be included in the contract; that it was his intention to get a man to make those cases that made a specialty of that class of work, and he did not know what kind of cases he would put in there until he got the building up, or at least far enough along so that he and his father could decide."

Williamson further testified Stanley Milward said there was some little difference between his father's ideas and his, and that he wasn't quite sure whether his father would allow him to put up as fine cases as he expected to; and so he thought it advisable to leave this out of the contract entirely.

Giannini, the architect who drew the plans and specifications under the direction of Stanley Milward and after consultation with him, says Milward never gave him any instructions at that time for detail drawings of any show cases, for the reason that it involved a great amount of detail information and data, which they did not then have; that no reference was made in the original specifications by way of detail of construction or divisions; nothing was put on the original plans that would show the exact intention so far as the carrying out of the work as it was carried out, and that a person making a bid could not have formed any estimate of the cost of the cases from the original plans and specifications. In this Giannini is supported architects Smith, Lyons and Rowe.

It was not until February, 1906, after the building was practically finished, that Giannini went to Louisville with Stanley Milward, and they there got data and suggestions from which he subsequently drew the detail plans from which the cases were finally made. He makes it perfectly plain that it was not the intention of the original plans and specifications to take into consideration the making of the coffin cases, and that no intelligent bid could then have been made as to their cost.

None of the contractors who bid upon this work would say they could make an intelligent bid upon the cases from the plans and specifications. Moore, one of the bidders, who testifies for appellee, says that although there was nothing in the specifications to guide him, he bid upon the cases at a guess, putting them at $450.00, which was less than half of their cost, as finally made.

The substance of Milward's claim is that he verbally informed Corbin all about the cases. Corbin, however, contradicts Milward; and the contract being in writing, it must control. Provident Savings Life Assurance Society v. Sherrer, 151 Ky., 301.

Furthermore, some attempt has been made to show that it is customary for contractors to bid generally upon work to be done according to details subsequently worked out and furnished to the contractor; and that the specifications, in another clause, provide for such "additional drawings and specifications as may be necessary to detail and illustrate the work to be done." But this provision does not strengthen appellee's position, since it, no more than the former clause quoted, provides what work is to be done.

Detail drawings are drawings to a large scale, often at full size, to accurately express as to material, design and size, what is expressed in general terms in the original drawings. For instance, in the general plans of a court house or other public building, there may be certain carvings in stone drawn at a small scale, which would only indicate that carvings are to be there, and later the architect would furnish details of the carving in minutiae, showing its exact design and form. It appears, however, from the testimony of Smith, a competent architect, that it would be necessary, in such a case, for the original drawings to be so designed that the contractor could form a correct opinion of the cost, labor and material required to execute the drawings.

Again, when asked if the contractor would be expected to do carving according to details to be thereafter supplied, he said he would not be required to do it unless the original plans showed the extent and the amount of the carving to be done, as they always do.

Upon this subject Smith testified as follows:

"Q. If the original plan showed the extent and the amount of the carving to be done, what would be the use of detail drawings? A. That is just what a detail

drawing is for; to see whether to make a strawberry leaf, or an acanthus leaf, or rose, scroll or other ornament. It would make no difference to the contractor as to the cost.

"Q. If the original drawing shows the extent and amount of that carving, where would be the necessity for detail drawings? A. To show the minute design. I have answered that once. Whether it would be a strawberry leaf, or an acanthus leaf, or rose, or other ornament. An illustration of detail is right before me in this present set of plans. The front elevation shows a bay-window and certain ornaments or a frieze, which would give the contractor a fair idea of its extent and character. The detail drawings, which are of a larger scale, show the more minute design and material in all its parts."

It is plain that the specifications did not show sufficient or definite plans, either in the aggregate or in detail, to enable a bidder to know what would be expected of him. There is nothing to show of what material the cases were to be made, their size or finish, or whether they would cost $100.00 or $1,000.00. They actually cost $982.50. Indeed, we might have rested this question of fact upon the opinion of the chancellor, in which he said:

"What these cases would cost could have been nothing less than a bare conjecture so far as the specifications are concerned. They could have cost $2,000.00 as easily as $1,000.00. They could have been furnished with plain or plate glass, or the doors could have been of plain wood. They could have had pine columns or mahogany, or no columns at all. They could have had backs or no backs, partitions or no partitions. The whole question resolves itself into one of inestimable confusion. The specifications give to the bidder no information whatever upon which an intelligent bid could be based."

But in applying the law under this state of facts, we think the chancellor was clearly in error. In no event could the cost of the cases have been divided between Corbin and Milward; one or the other must bear it wholly.

Sexton v. City of Chicago, 107 Ill., 330, is in point. In that case the city furnished plans and specifications upon which bids were asked. The original plans showed openings for sky-lights, but nothing as to the size,

weights or data concerning the lights. Afterwards, the necessary information was furnished, the city claiming, as Milward does, that the sky-lights were included in the contract.

But in holding that tney were not, the court said:

"The plans and specifications under which the work was let having by reference been made a part of the contract itself, it became a question of law whether the exactions of the city were well founded or not. The entire work was to be done according to said plans and specifications and upon turning to them so far as they relate to the sky-lights, we find they show the openings and iron frame work constituting the foundation for five skylights. We also discover .certain lines passing across the opening indicating that skylight structures of some kind were ultimately intended for the building, but no sizes, weights, or data are given to guide one either in their construction or the estimation of their cost, except the size of the opening. Had the appellants been forced to construct the skylights under the circumstances, he would have been compelled to have either gotten up an additional plan and specifications for his employes to work, or the city would have had to furnish them, in neither of which cases would they have been constructed according to the plans and specifications on file in the appellee's office at the time the contract was entered into. This we think conclusively shows the skylights were not embraced in this contract."

We think the foregoing is a sound view of the law applicable to cases of this character; and, that it easily appears from the proof that appellee, much less the appellant, never contemplated the coffin cases should be included in the contract. To say the least, it would be unusual to expect a contractor to bid in the dark upon work that cost nearly $1,000.00, and subsequently to furnish him with plans in whose making he had no voice, or notice, even. If appellee's contention is right, he could have required appellant to make coffin cases at a cost of $2,000.00 or more, instead of $982.50, or at any price that might have suited his fancy or taste. We find nothing in the contract or proof that warrants such a construction; on the contrary, the evidence of Williamson and the three architects as to the practical working of the contract sustains the view that it contained no provision for furnishing coffin cases.

Judgment reversed, with instructions to set aside the judgment appealed from, and to enter a judgment for appellant in accordance with the prayer of the petition.